1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    SCOTTSDALE INSURANCE COMPANY,          Case No.  15-cv-02896-HSG

8              Plaintiff,
                                            **ORDER DENYING DEFENDANT'S**
9         v.                                **MOTION TO DISMISS; SETTING**
                                            **CASE MANAGEMENT CONFERENCE**
10   HUDSON SPECIALTY INSURANCE
     COMPANY,                               Re: Dkt. No. 16
11
               Defendant.

12

13        Before the Court is Defendant Hudson Specialty Insurance Company's ("Defendant")

14   motion to dismiss Plaintiff Scottsdale Insurance Company's ("Plaintiff") complaint, Dkt. No. 1

15   ("Compl."). Dkt. No. 16 ("Mot."). Plaintiff, an excess insurance provider, asserts claims for

16   equitable indemnification and subrogation against Defendant, a primary insurance provider, for

17   allegedly failing to contribute the full amount required under the primary policy. Defendant

18   contends that it made a complete payment and the suit should be dismissed for failure to state a

19   claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Plaintiff

20   has filed an opposition, Dkt. No. 16 ("Opp."), and Defendant has replied, Dkt. No. 19 ("Reply").

21        Under Civil Local Rule 7-1(b) and Federal Rule of Civil Procedure 78(b), this motion was

22   deemed suitable for disposition without oral argument. The Court has carefully considered the

23   parties' arguments in their briefs. For the reasons set forth below, the Court **DENIES** Defendant's

24   motion to dismiss.

25   **I.      BACKGROUND**

26        **A.      Factual Allegations**

27        This is a dispute between an excess and a primary insurance carrier regarding the amount

28   of their obligations to resolve a claim resolved against the insured. The Court first discusses the

1    terms of the primary policy and the terms of the excess policy,[1] before proceeding to discuss the

2    underlying lawsuit, its settlement, and the structure of the insurance payments under that claim.

3                            1.    The Primary Insurance Policy

4          Priority Parking Services, CA, LLC ("Priority Parking") leased a parking garage located at

5    1040 Sacramento Street in San Francisco, California ("Brocklebank Garage"), from Nob Hill

6    Properties ("Nob Hill") on or about May 2, 2005.  Compl. ¶¶ 10-11.  Nob Hill assigned its

7    leasehold interest to Fritz Property Group, Inc. ("Fritz") on or about July 31, 2008.  Id. ¶ 12.

8          Defendant afforded primary liability insurance to Priority Parking for the period from May

9    1, 2011, to May 1, 2012 ("Primary Policy").  Id. ¶ 13 & Ex. A.  The Primary Policy included

10   commercial general liability coverage.  Id., Ex. A at SIC_000014-28.  Section I of the commercial

11   general liability coverage form within the Primary Policy set forth three separate and distinct types

12   of coverage: (1) Coverage A Bodily Injury and Property Damage Liability ("Coverage A"); (2)

13   Coverage B Personal and Advertising Injury Liability; and (3) Coverage C Medical Payments.

14   Id., Ex. A at SIC_000014-20.  Of these coverage agreements, only Coverage A is now at issue.

15         Coverage A covered bodily injury claims as follows: "[Defendant] will pay those sums that

16   [Priority Parking] becomes legally obligated to pay as damages because of 'bodily injury' . . . to

17   which this insurance applies."  Id. ¶ 14.  Coverage A applied only if the bodily injury was caused

18   by an "occurrence" that took place in the "coverage territory" during the policy period.  Id. ¶ 15.

19   "Bodily injury" included "bodily injury . . . sustained by a person[.]"  Id. ¶ 16.  "Occurrence"

20   included "an accident."  Id. ¶ 17.  The Brocklebank Garage was in covered territory.  Id. ¶ 22.

21         By endorsement,[2] the Primary Policy included an additional provision entitled "Parking

22   Operations Errors and Omissions Liability."  Id., Ex. A at SIC_000042.  Its preamble stated:

23         "This endorsement modifies insurance provided under the following:

24              COMMERCIAL GENERAL LIABILITY COVERAGE PART

25              Under SECTION I - COVERAGES

26   _____

27   [1] The Court considers the insurance policies that Plaintiff attaches to the complaint as written
     instruments "part of the pleading for all purposes."  See Fed. R. Civ. P. 10(c).

28   [2] In the insurance industry, "endorsement" is a term of art that refers to a rider that amends the
     terms of a foregoing insurance policy.  Black's Law Dictionary 644 (10th ed. 2014).

United States District Court
Northern District of California

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY[.]"

*Id.* Beneath that preamble, the endorsement stated: "Insuring Agreement is amended to include: [subpart] e. [Defendant] will pay those sums [Priority Parking] becomes legally obligated to pay as damages because of any negligent act, error or omission during the policy period arising out of [Priority Parking's] parking operations." *Id.* ¶ 18. The terms "negligent act," "error," and "omission" were left undefined. *Id.* ¶¶ 19-21.

The Primary Policy also included a set of "Common Policy Declarations" that preceded the commercial general liability form discussed above. *Id.*, Ex. A at SIC_000001-6. On the "Liability Coverage" declaration page, there were four tables set forth under different headings. *Id.*, Ex. A at SIC_000005. Under the heading "Commercial General Liability" and the subheading "Limits of Insurance," the Primary Policy set a coverage limit of $1,000,000 for "each occurrence." *Id.* ¶ 23. Under the heading "Parking Operations Errors and Omissions" and the subheading "Limits of Insurance," the Primary Policy set a coverage limit of $1,000,000 for "each claim." *Id.*

Section III of the commercial general liability form provided that the "Limits of Insurance shown in the Declarations and the rules below fix the most [Defendant] will pay regardless of the number of: Insureds; Claims made or 'suits' brought; or Persons or organizations making claims or bringing 'suits.'" *Id.*, Ex. A at SIC_000022. The rules below that clause provided two terms that are relevant to this dispute. First: "The General Aggregate Limit is the most [Defendant] will pay for the sum of: Medical expenses under Coverage C; Damages under Coverage A[;] and Damages under Coverage B." *Id.*, Ex. A at SIC_000023. Second, as actually formatted:

> "Subject to [the General Aggregate Limit], the Each Occurrence Limit is the most we will pay for the sum of:
> a.  Damages under Coverage A; and
> b.  Medical Expenses under Coverage C
> because of all 'bodily injury' and 'property damages' arising out of any one 'occurrence.'

*Id.*

## 2.   The Excess Insurance Policy

Plaintiff afforded commercial excess liability coverage to Priority Parking for the policy period of May 1, 2011, to May 1, 2012 ("Excess Policy"). *Id.* ¶ 25 & Ex. B. The Excess Policy

contained the following insuring agreement:

> "[Plaintiff] will pay on behalf of [Priority Parking] the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies. We will have the right and duty to defend [Priority Parking] against any suit seeking damages for such 'injury and damage' when the applicable limits of 'controlling underling insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance.'"

*Id.* ¶ 26. The term "ultimate net loss" was defined as: "the total sum, after reduction for recoveries, or salvages collectible, that [Priority Parking] becomes legally obligated to pay as damages by reason of . . . Settlements[.]" *Id.* ¶ 30. The term "retained limit" was defined as "the available limits of 'controlling underlying insurance' applicable to the claim." *Id.* ¶ 27. The term "controlling underlying insurance" was defined as "any policy of insurance or self-insurance listed in the Declarations under the Schedule of 'controlling underlying insurance'." *Id.* ¶ 28. To that effect, the schedule of controlling underlying insurance identified the Primary Policy. *Id.* ¶ 29.

### 3. Underlying Injury and Subsequent Lawsuit

On January 25, 2012, Karen Nikolakakis was seriously injured when she patronized the Brocklebank Garage. *Id.* ¶ 33. On June 25, 2012, Ms. Nikolakakis filed a complaint for damages against Fritz, the leaseholder at the time of the injury, in California state court. *Id.* ¶ 34 & Ex. C ("Underlying Lawsuit"); *see also id.* ¶ 12. The Underlying Lawsuit alleged that Ms. Nikolakakis sustained "bodily injury" caused by an "occurrence" and sought damages caused by a negligent act, error, or omission arising out of Priority Parking's operations. *Id.* ¶ 36.

Fritz tendered defense of the Underlying Lawsuit to its insurers, Greenwich Insurance Co. and Lexington Insurance Co., as well as to Priority Parking's insurers, Defendant and Plaintiff, and sought indemnity from each of them. *Id.* ¶ 37.

### 4. Settlement of the Underlying Lawsuit

Ms. Nikolakakis settled the Underlying Lawsuit against Fritz and Priority Parking for $6,500,000 on January 24, 2014. *Id.* ¶ 38. By the terms of the settlement, $2,600,000 of the total settlement amount was paid on behalf of Priority Parking as follows: $500,000 by Defendant and $2,100,000 by Plaintiff. *Id.* ¶ 39. The remaining $3,900,000 of the total settlement amount was

United States District Court
Northern District of California

1  paid on behalf of Fritz as follows: $500,000 by Defendant, $3,000,000 by Greenwich, and

2  $400,000 by Lexington. *Id.* ¶ 40. In contributing to the settlement, Plaintiff alleges that it did not

3  act as a volunteer, but to settle the liability claims in the Underlying Lawsuit. *Id.* ¶ 41.

   **B.      Procedural History**

5  Plaintiff filed this diversity action on June 22, 2015. *Id.* ¶ 1. Plaintiff alleges that while

6  the Primary Policy affords $1,000,000 in coverage for "each occurrence" of bodily injury, it also

7  separately affords $1,000,000 in coverage for "each claim" under the parking operations errors

8  and omissions coverage endorsement. *Id.* ¶ 43. Despite that purportedly overlapping coverage,

9  Defendant contributed only $1,000,000 toward the settlement of the Underlying Lawsuit. For that

10 reason, Plaintiff seeks a declaratory judgment that Defendant was required to pay $2,000,000 on

11 behalf of Priority Parking before the Excess Policy attached. *Id.* ¶¶ 44-46. On that same basis,

12 Plaintiff seeks equitable subrogation and indemnity of the $1,000,000 it claims to have overpaid in

13 the settlement of the Underlying Lawsuit that accrued to the benefit of Defendant. *Id.* ¶¶ 47-60.

14 Defendant moves to dismiss the complaint. Defendant claims while there is no dispute the

15 parking errors and omissions endorsement provided additional coverage, it was expressly subject

16 to the $1,000,000 per occurrence coverage limit set forth in the declarations as part of Coverage A.

17 *Id.* Plaintiff responds that fundamental principles of contract interpretation require that the Court

18 find Coverage A and the parking errors and omissions endorsement are separate coverages. Opp.

19 at 7. Because both coverages apply, the Court must permit them to "stack"—meaning that they

20 must aggregate for coverage purposes—in the absence of any express anti-stacking provision.

21 Opp. at 7-8. At most, Plaintiff argues, the Primary Policy is ambiguous as to whether there are

22 two separate coverages and, therefore, dismissal is not appropriate. *Id.* at 10-11. Defendant

23 replies that the question of stacking is a non sequitur: there is only one coverage. Reply at 1-4.

24 **II.     LEGAL STANDARD**

25 Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint

26 for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

27 dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its

28 face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the

United States District Court
Northern District of California

1    plaintiff pleads "factual content that allows the court to draw the reasonable inference that the

2    defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3         For the purposes of this analysis, a court "accept[s] factual allegations in the complaint as

4    true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek*

5    *v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Moreover, a court

6    "presume[s] that general allegations embrace those specific facts that are necessary to support the

7    claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994).  A court is not required,

8    however, to "assume the truth of legal conclusions merely because they are cast in the form of

9    factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal

10   quotation omitted).  "[C]onclusory allegations of law and unwarranted inferences are insufficient

11   to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

12   **III.    DISCUSSION**

13        This dispute revolves around a question of contractual interpretation.  Defendant contends

14   that the two coverage provisions at issue in the Primary Policy were both subject to the same

15   $1,000,000 per occurrence limit, while Plaintiff argues that, as separate and distinct coverage

16   agreements, they were not.  If Plaintiff is correct, then it has properly stated a claim for equitable

17   subrogation against Defendant.  *See Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 72 Cal.

18   App. 4th 1063, 1078 (1999) ("[S]ubrogation takes the form of an insurer's right to be put in the

19   position of the insured in order to pursue recovery from third parties legally responsible to the

20   insured for a loss which the insurer has both insured and paid[.]")[3]  The Court cannot conclude

21

22   ─────────────────────────
     [3] Although the parties did not brief the issue, it is not clear to the Court that Plaintiff can ever state

23   a claim for equitable indemnification as an excess insurance provider suing a primary insurance
     provider on the basis of incomplete coverage.  *See Fireman's Fund Ins. Co v. Maryland Cas. Co.*,

24   65 Cal. App. 4th 1279, 1300 (1998) ("[E]quitable contribution is only available where coinsurers
     share the same primary level of liability on the same risk.  Consequently, in the absence of an

25   express agreement to the contrary, there is never any right to contribution between primary and
     excess carriers of the same insured."); *see also Gem Developers v. Hallcraft Homes of San Diego,*

26   *Inc.*, 213 Cal. App. 419, 426 (1989) ("The purpose of equitable indemnification is to avoid the
     unfairness, under joint and several liability theory, of holding one defendant liable for the

27   plaintiff's entire loss while allowing another responsible defendant to escape scot free.  It is an
     extension of the comparative fault doctrine which allowed loss to be apportioned between plaintiff

28   and defendants according to their respective responsibility for the loss.").  In any case, the Court
     does not reach this issue because Defendant did not raise it and the parties did not brief it.

United States District Court
Northern District of California

1   that Plaintiff's interpretation is unreasonable as a matter of law and therefore must deny

2   Defendant's motion.

3           **A.        California Rules for Interpreting Insurance Contracts**

4           The Court begins with first principles.  California law controls this dispute in diversity.

5   *See Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001).  Under California law,

6   "interpretation of an insurance policy is a question of law that is decided under settled rules of

7   contract interpretation."  *State v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (2012).  "While

8   insurance contracts may have special features, they are still contracts to which the ordinary rules

9   of contractual interpretation apply."  *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992).

10  "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the

11  parties."  *Id.*  "Such intent is to be inferred, if possible, solely from the written provisions of the

12  contract."  *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990).  "If contractual language is clear

13  and explicit, it governs."  *Bank of the West*, 2 Cal. 4th at 1264.  "The 'clear and explicit' meaning

14  of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in

15  a technical sense or a special meaning is given to them by usage,' controls judicial interpretation."

16  *Waller v. Track Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code § 1644).

17          "A policy provision will be considered ambiguous when it is capable of two or more

18  constructions, both of which are reasonable."  *Id.*  "A term is not ambiguous merely because the

19  policies do not define it."  *Continental*, 55 Cal. 4th at 195.  "Nor is it ambiguous because of

20  disagreement concerning the meaning of a phrase or the fact that a word or phrase isolated from its

21  context is susceptible of more than one meaning."  *Id.* (internal quotations omitted).  "Language in

22  a contract must be construed in the context of that instrument as a whole, and in the circumstances

23  of that case, and cannot found to be ambiguous in the abstract."  *Bank of the West*, 2 Cal. 4th at

24  1265 (internal quotations omitted).  "If an asserted ambiguity is not eliminated by the language

25  and context of the policy, courts then invoke the principle that ambiguities are generally construed

26  against the party who caused the uncertainty to exist (*i.e.*, the insurer) in order to protect the

27  insured's reasonable expectation of coverage."  *La Jolla Beach & Tennis Club, Inc. v. Indus.*

28  *Indemnity Co.*, 9 Cal. 4th 27, 37 (1994).  In the context of a claim for equitable subrogation, the

United States District Court
Northern District of California

7

"insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured." *See Reliance,* 72 Cal. App. 4th at 1078.

### B.     Interpretation of the Primary Policy

Applying these general principles, the Court turns to the insurance policy at issue in this case.  Plaintiff argues that the parking operations error and omissions coverage endorsement constitutes a stand-alone coverage agreement and is not part of Coverage A.  Defendant responds that the parking operations endorsement itself clearly and explicitly modifies the "Commercial General Liability Coverage Part under Section I - Coverages," and specifically "Coverage A Bodily Injury and Property Damage Liability."  Compl., Ex. A at SIC_000042.  On this point, the Court finds that Defendant is undoubtedly correct.  The parking operations endorsement could not be clearer that its additional coverage falls under the ambit of Coverage A.   Accepting Plaintiff's argument would require the Court to disregard the plain language of the endorsement.  "If contractual language is clear and explicit, it governs." *Bank of the West,* 2 Cal. 4th at 1264.

Defendant contends that if the parking operations endorsement is part of Coverage A, it automatically follows that the endorsement is subject to the limits of insurance terms that govern all coverage provisions under the commercial general liability form.  To that effect, Defendant points to the "each occurrence" limit set forth in the commercial general liability form, which provides:

> "Subject to [the General Aggregate Limit], the Each Occurrence Limit is the most we will pay for the sum of:
> a.  Damages under Coverage A; and
> b.  Medical Expenses under Coverage C
> because of all 'bodily injury' and 'property damages' arising out of any one 'occurrence.'

*Id.*, Ex. A at SIC_000023.  In the liability coverage declaration, the "Each Occurrence Limit" is set at $1,000,000 for commercial general liability.  *Id.*, Ex. A at SIC_000005.  Reading these provisions together, Defendant argues that the parking operations endorsement was subject to a $1,000,000 limit for each occurrence.  Because occurrence is defined in part as "an accident," which plainly encompasses the allegations of the Underlying Lawsuit, Defendant posits that its liability is limited in this instance to $1,000,000.  *See id.*, Ex. A at SIC_000027.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Plaintiff disagrees.  Its position is that the "each occurrence" limit that applies to the sum

2   of damages under Coverage A and medical expenses under Coverage C applies only to the bodily

3   injury and property damages coverage provision.  In support of that interpretation, Plaintiff points

4   to the qualifying clause that ends the "each occurrence" limit provision: "because of all 'bodily

5   injury' and 'property damages' arising out of any one 'occurrence.'"  *Id.*, Ex. A at SIC_000023.

6   Because this language parallels the bodily injury and property damage coverage provision, but not

7   the parking operations coverage provision, which discusses a "negligent act, error or omission,"

8   Plaintiff argues the provision is totally inapplicable to the parking operations coverage provision.

9   In its place, Plaintiff contends that the liability coverage declaration provides a limit of $1,000,000

10  for "each claim" made under the parking operations coverage.  *Id.*, Ex. A at SIC_000005.

11   Defendant replies that the liability coverage declarations page does not control the

12  interpretation and application of limits of liability.  At most, Defendant argues, the "each claim"

13  limit for parking operations on the declarations page creates a potential uncertainty about policy

14  limits that must be resolved by referencing the policy's liability limits.  *See United Servs. Auto.*

15  *Ass'n v. Baggett*, 209 Cal. App. 3d 1387, 1397 (1989); *see also George v. Auto. Club of S. Cal.*,

16  201 Cal. App. 4th 1112, 1128 (2011) ("[T]he declaration [page] does not purport to set forth or

17  define the operative terms . . . any ambiguity in the declaration is resolved by the terms of the

18  policy.")  And, as the commercial general liability form states, "regardless of the number of . . .

19  claims made[,]" the "each occurrence" limit controls.  *See* Compl., Ex. A at SIC_000022-23.

20   Defendant is correct that the "each occurrence" limit clearly applies no matter how many

21  qualifying claims trigger coverage under the bodily injury and property damage provision.  But

22  Defendant does not respond to Plaintiff's argument that the "each occurrence" limit could

23  reasonably be interpreted to apply *only* to the bodily injury and property damage provision and not

24  the parking operations coverage provision.  That said, if there were nothing more to Plaintiff's

25  argument, the Court likely would find its interpretation of the "each occurrence" provision to be

26  unreasonable.  "Language in a contract must be construed in the context of that instrument as a

27  whole, and in the circumstances of that case, and cannot found to be ambiguous in the abstract."

28  *Bank of the West*, 2 Cal. 4th at 1265 (internal quotations omitted).  It would be unreasonable to

United States District Court
Northern District of California

1    find that Defendant did not intend the parking operations coverage provision to be limited by the

2    "each occurrence" limit, if that was the only non-aggregate limit of insurance in the policy.

3              But the fact that the liability coverage declarations page sets forth a separate basis for

4    determining the limit of the parking operations coverage based on "each claim" lends additional

5    credence to Plaintiff's interpretation of the "each occurrence" limit provision.  Under California

6    insurance law, if the term "claim" is left undefined, "the common law definition will control: i.e.,

7    a 'claim' is a *demand for something as a right or as due*[.]"  7G-G Cal. Prac. Guide: Ins. Litig. §

8    7.1946.17 (emphasis original) (citing *Abifadel v. Cigna Ins. Co.*, 8 Cal. App. 4th 145, 160 (1992)).

9    Applying this definition, the liability coverage declaration page's use of the word "claim" suggests

10   that the parking operations coverage provision could reasonably be interpreted as "claims-made"

11   coverage that is distinct from the "occurrence"-based coverage of the bodily injury and property

12   damage provision.  *See* 7A-C Cal. Prac. Guide: Ins. Litig. §§ 7:41 (occurrence policies), 7:79

13   (claims-made policies).  While it is a close question, that possibility makes the "each occurrence"

14   limit provision capable of two or more reasonable constructions, which is enough for Plaintiff to

15   survive dismissal at this stage.

16             Accordingly, because the Court cannot say that the parking operations coverage provision

17   was unambiguously subject to the "each occurrence" limit provision as a matter of law, it cannot

18   find that that the separate "each claim" limit did not cause the coverage provisions to stack.

19   **IV.    CONCLUSION**

20             For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss.  The Court

21   **SETS** a further case management conference to set a schedule for this case on April 12, 2016, at

22   2:00pm.  The parties are required to file a joint case management conference statement by April 5,

23   2016.

24             **IT IS SO ORDERED.**

25   Dated: March 25, 2016

26

27

28
                                                    HAYWOOD S. GILLIAM, JR.
                                                    United States District Judge