UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>HUDSON SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | Case No. 15-cv-02896-HSG<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 57, 63 |

Before the Court are Plaintiff Scottsdale Insurance Company's ("Scottsdale") and Defendant Hudson Specialty Insurance Company's ("Hudson") cross-motions for summary judgment. *See* Dkt. Nos. 57, 63. Scottsdale, an excess insurance provider, asserts claims for equitable indemnification and subrogation against Hudson, a primary insurance provider, for allegedly failing to contribute the full amount required under the primary policy. Hudson contends that it made a complete payment under the terms of the primary policy.

Under Civil Local Rule 7-1(b) and Federal Rule of Civil Procedure 78(b), this motion was deemed suitable for disposition without oral argument. Having carefully considered the parties' arguments, the Court **DENIES** Scottsdale's motion for summary judgment, and **GRANTS** Hudson's cross-motion for summary judgment for the reasons set forth below.

**I.    BACKGROUND**

**A.    Undisputed Facts**

This is a dispute between an excess and a primary insurance carrier regarding the amount of their obligations to resolve a claim settled with the insured. The Court first discusses the terms of the primary and excess policies, before discussing the underlying lawsuit, its settlement, and the structure of the insurance payments under that claim. Unless otherwise stated, the following facts

are undisputed. *See* Dkt. Nos. 1 ("Compl."), 25 ("Answ.").[1]

                1.      <u>The Primary Insurance Policy</u>

Priority Parking Services, CA, LLC ("Priority Parking") leased a parking garage located at 1040 Sacramento Street in San Francisco, California ("Brocklebank Garage") from Nob Hill Properties ("Nob Hill") on or about May 2, 2005. Compl. ¶¶ 10-11. Nob Hill assigned its leasehold interest to Fritz Property Group, Inc. ("Fritz") on or about July 31, 2008. *Id.* ¶ 12.

Hudson provided primary liability insurance to Priority Parking for the period from May 1, 2011, to May 1, 2012 ("Primary Policy"). *Id.* ¶ 13; Dkt. No. 60, Ex. 1. The Primary Policy included commercial general liability coverage. Dkt. No. 60, Ex. 1 at POLICY0014-28. Section I of the commercial general liability coverage form within the Primary Policy set forth three separate and distinct types of coverage: (1) Coverage A Bodily Injury and Property Damage Liability ("Coverage A"); (2) Coverage B Personal and Advertising Injury Liability; and (3) Coverage C Medical Payments. *Id.*, Ex. 1 at POLICY0014-20. Of these coverage agreements, only Coverage A is now at issue.

Coverage A covered bodily injury claims as follows: "[Hudson] will pay those sums that [Priority Parking] becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." Compl. ¶ 14. Coverage A applied only if the bodily injury was caused by an "occurrence" that took place in the "coverage territory" during the policy period. *Id.* ¶ 15. "Bodily injury" included "bodily injury . . . sustained by a person[.]" *Id.* ¶ 16. "Occurrence" included "an accident." *Id.* ¶ 17. The Brocklebank Garage was in covered territory. *Id.* ¶ 22.

By endorsement,[2] the Primary Policy included an additional provision entitled "Parking Operations Errors and Omissions Liability" ("Parking Operations E&O"). Dkt. No. 60, Ex. 1 at POLICY0042. Its preamble stated:

//

---

[1] Unless otherwise stated, Hudson admits in its answer to the complaint every undisputed fact relating to the Primary Policy. *See* Dkt. No. 25.
[2] In the insurance industry, "endorsement" is a term of art that refers to a rider that amends the terms of a prior insurance policy. Black's Law Dictionary 644 (10th ed. 2014).

2

1  "This endorsement modifies insurance provided under the following:

2      COMMERCIAL GENERAL LIABILITY COVERAGE PART
    Under SECTION I - COVERAGES

3      COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY[.]"

4  *Id.*, Ex. 1 at POLICY0042. Beneath that preamble, the endorsement stated: "Insuring Agreement

5  is amended to include: [subpart] e. [Hudson] will pay those sums [Priority Parking] becomes

6  legally obligated to pay as damages because of any negligent act, error or omission during the

7  policy period arising out of [Priority Parking's] parking operations." Compl. ¶ 18. The terms

8  "negligent act," "error," and "omission" were left undefined. *Id.* ¶¶ 19-21.

9      The Primary Policy also included a set of "Common Policy Declarations" that preceded the

10  commercial general liability form discussed above. Dkt. No. 60, Ex. 1 at POLICY0002-06. On

11  the "Liability Coverage" declarations page, there were four tables set forth under different

12  headings. *Id.*, Ex. 1 at POLICY0005. Under the heading "Commercial General Liability" and the

13  subheading "Limits of Insurance," the declaration set a coverage limit of $1,000,000 for "each

14  occurrence." *Id.*, Ex. 1 at POLICY0005. Under the heading "Parking Operations Errors and

15  Omissions" and the subheading "Limits of Insurance," the declaration set a coverage limit of

16  $1,000,000 for "each claim." *Id.*, Ex. 1 at POLICY0005.

17      Section III of the commercial general liability agreement provided that the "Limits of

18  Insurance shown in the Declarations and the rules below fix the most [Hudson] will pay regardless

19  of the number of: (a) Insureds; (b) Claims made or 'suits' brought; or (c) Persons or organizations

20  making claims or bringing 'suits.'" *Id.*, Ex. 1 at POLICY0022. The rules below that clause

21  provided two terms relevant to this dispute. First: "The General Aggregate Limit is the most

22  [Hudson] will pay for the sum of: Medical expenses under Coverage C; Damages under Coverage

23  A[;] and Damages under Coverage B." *Id.*, Ex. 1 at POLICY0023. Second, as actually formatted:

24      Subject to [the General Aggregate Limit], the
    Each Occurrence Limit is the most [Hudson] will pay for

25      the sum of:
    a. Damages under Coverage A; and

26      b. Medical Expenses under Coverage C
    because of all 'bodily injury' and 'property dam-

27      ages' arising out of any one 'occurrence.'

28  *Id.*, Ex. 1 at POLICY0023.

### 2. The Excess Insurance Policy

Scottsdale provided commercial excess liability coverage to Priority Parking for the policy period of May 1, 2011, to May 1, 2012 ("Excess Policy"). Compl. ¶ 25 & Ex. B. The Excess Policy contained the following insuring agreement:

> [Scottsdale] will pay on behalf of [Priority Parking] the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies. We will have the right and duty to defend [Priority Parking] against any suit seeking damages for such 'injury and damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance.'

Compl. ¶ 26. The term "ultimate net loss" was defined as: "the total sum, after reduction for recoveries, or salvages collectible, that [Priority Parking] becomes legally obligated to pay as damages by reason of . . . Settlements[.]" *Id.* ¶ 30. The term "retained limit" was defined as "the available limits of 'controlling underlying insurance' applicable to the claim." *Id.* ¶ 27. The term "controlling underlying insurance" was defined as "any policy of insurance or self-insurance listed in the Declarations under the Schedule of 'controlling underlying insurance.'" *Id.* ¶ 28. The schedule of controlling underlying insurance identified the Primary Policy. *Id.* ¶ 29.

### 3. Underlying Injury and Subsequent Lawsuit

On January 25, 2012, Karen Nikolakakis was seriously injured when she patronized the Brocklebank Garage. *Id.* ¶ 33. On June 25, 2012, Ms. Nikolakakis filed a complaint for damages against Fritz, the leaseholder at the time of the injury, in California state court. *Id.* ¶¶ 12, 34 & Ex. C ("Underlying Lawsuit"). The Underlying Lawsuit alleged that Ms. Nikolakakis sustained "bodily injury" caused by an "occurrence" and sought damages caused by a negligent act, error, or omission arising out of Priority Parking's operations. Compl. ¶ 36.

Fritz tendered defense of the Underlying Lawsuit to its insurers, Greenwich Insurance Co. and Lexington Insurance Co., as well as to Priority Parking's insurers, Hudson and Scottsdale, and sought indemnity from each of them. *Id.* ¶ 37.

### 4. Settlement of the Underlying Lawsuit

Ms. Nikolakakis settled the Underlying Lawsuit against Fritz and Priority Parking for

$6,500,000 on January 24, 2014. *Id.* ¶ 38. By the terms of the settlement, $2,600,000 of the total settlement amount was paid on behalf of Priority Parking as follows: $500,000 by Hudson and $2,100,000 by Scottsdale. *Id.* ¶ 39. The remaining $3,900,000 of the total settlement amount was paid on behalf of Fritz as follows: $500,000 by Hudson, $3,000,000 by Greenwich, and $400,000 by Lexington. *Id.* ¶ 40. In contributing to the settlement, Scottsdale stated that it did not act as a volunteer, but instead participated in order to settle the liability claims in the Underlying Lawsuit. *Id.* ¶ 41.

### B. Procedural History

Scottsdale filed this diversity action on June 22, 2015. *Id.* ¶ 1. The complaint alleges that while the Primary Policy affords $1,000,000 in coverage for "each occurrence" of bodily injury, it also separately affords $1,000,000 in coverage for "each claim" under the Parking Operations E&O coverage endorsement. *Id.* ¶ 43. Despite that purportedly overlapping coverage, Hudson contributed only $1,000,000 toward the settlement of the Underlying Lawsuit. For that reason, Scottsdale seeks a declaratory judgment that Hudson was required to pay $2,000,000 on behalf of Priority Parking before the Excess Policy attached. *Id.* ¶¶ 44-46. On that same basis, Scottsdale seeks equitable subrogation and equitable indemnity of the $1,000,000 it claims to have overpaid in the settlement of the Underlying Lawsuit that accrued to the benefit of Hudson. *Id.* ¶¶ 47-60.

On July 21, 2015, Hudson filed a motion to dismiss Scottsdale's complaint, alleging many of the same arguments it now makes here. *See* Dkt. No. 16. The Court denied the motion on March 25, 2016. *See* Dkt. No. 23. Both parties filed motions for summary judgment on January 19, 2017. *See* Dkt. Nos. 57, 63. Both parties opposed on February 2, 2017, s*ee* Dkt. Nos. 73, 75, and both parties replied on February 9, 2017, s*ee* Dkt. Nos. 82, 83.

## II. LEGAL STANDARD

Summary judgment is proper where the pleadings and evidence demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute

5

1   is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

2   party." *Id.*

3         The moving party bears "the initial responsibility of informing the district court of the

4   basis for its motion." *Celotex*, 477 U.S. at 323. To satisfy this burden, the moving party must

5   demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322. To survive a motion

6   for summary judgment, the non-moving party must then show that there are genuine factual issues

7   that can only be resolved by the trier of fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736,

8   738 (9th Cir. 2000). To do so, the non-moving party must present specific facts creating a genuine

9   issue of material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

10        The court must review the record as a whole and draw all reasonable inferences in favor of

11  the non-moving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

12  However, unsupported conjecture or conclusory statements are insufficient to defeat summary

13  judgment. *Id.* Moreover, the court is not required "to scour the record in search of a genuine issue

14  of triable fact," *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), but rather

15  may limit its review to the documents submitted for purposes of summary judgment and those

16  parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*,

17  237 F.3d 1026, 1030 (9th Cir. 2001).

18  **III.   DISCUSSION**

19        Hudson contends that the two coverage provisions at issue in the Primary Policy were

20  subject to the same $1,000,000 per occurrence limit, while Scottsdale argues that, as separate and

21  distinct coverage agreements, they were not. This dispute therefore concerns a pure question of

22  law: the contractual interpretation of the Primary Policy. *See Powerine Oil Co., Inc. v. Superior*

23  *Court*, 37 Cal. 4th 377, 390 (2005) (holding that determination of "whether a particular

24  [insurance] policy provides a potential for coverage" is a question of law). While the Court could

25  not conclude that Scottsdale's interpretation was unreasonable at the motion to dismiss stage, it

26  now finds it unreasonable as a matter of law and grants Hudson's motion. *See* Dkt. No. 23.

27      **A.   California Rules for Interpreting Insurance Contracts**

28        California law controls this dispute in diversity. *See Freeman v. Allstate Life Ins. Co.*, 253

F.3d 533, 536 (9th Cir. 2001). Under California law, "interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation." *State v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (2012). "While insurance contracts may have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1264 (1992). "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Id.* "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990). "If contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264. "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code § 1644).

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Id.* "A term is not ambiguous merely because the policies do not define it." *Continental*, 55 Cal. 4th at 195. "Nor is it ambiguous because of disagreement concerning the meaning of a phrase or the fact that a word or phrase isolated from its context is susceptible of more than one meaning." *Id.* (internal quotations omitted). "Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and the language cannot be found to be ambiguous in the abstract." *Bank of the West*, 2 Cal. 4th at 1265 (internal quotations omitted). "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (*i.e.*, the insurer) in order to protect the insured's reasonable expectation of coverage." *La Jolla Beach & Tennis Club, Inc. v. Indus. Indemnity Co.*, 9 Cal. 4th 27, 37 (1994). In the context of a claim for equitable subrogation, the "insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured." *See Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 72 Cal. App. 4th 1063, 1078 (1999).

### B. Interpretation of the Primary Policy

Applying these general principles, the Court turns to the insurance policy at issue in this case. Scottsdale argues that the Parking Operations E&O coverage endorsement constitutes a stand-alone coverage agreement and is not part of Coverage A. *See* Dkt. No. 63 at 20. Hudson contends that "[t]he [Primary] Policy, by its express terms, included coverage for Parking Operations E&O under the policy's Bodily Injury and Property Damage Liability coverage (Coverage A)." Dkt. No. 57 at 12; *see* Dkt. No. 60, Ex. 1 at POLICY0042. On this point, the Court previously found that Hudson is undoubtedly correct, because the Parking Operations E&O endorsement could not be clearer that its additional coverage falls under the ambit of Coverage A. *See* Dkt. No. 23 at 8. Accepting Scottsdale's argument would have required the Court to disregard the plain language of the endorsement, but "[i]f contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264.[3]

Hudson contends that because the Parking Operations E&O endorsement is part of Coverage A, it automatically follows that the endorsement is subject to the limits of liability terms that govern all coverage provisions under the commercial general liability form. Dkt. No. 57 at 12. To that effect, Hudson points to the "each occurrence" limit set forth in the commercial general liability form, which provides:

> Subject to [the General Aggregate Limit], the Each Occurrence Limit is the most [Hudson] will pay for the sum of:
> a. Damages under Coverage A; and
> b. Medical Expenses under Coverage C
> because of all 'bodily injury' and 'property damages' arising out of any one 'occurrence.'

Dkt. No. 60, Ex. 1 at POLICY0023. In the liability coverage declaration, the "Each Occurrence Limit" is set at $1,000,000 for commercial general liability. *Id.*, Ex. 1 at POLICY0005. Reading these provisions together, Hudson argues that the Parking Operations E&O endorsement was

---

[3] Scottsdale's argument that two typographical errors in the Parking Operations E&O endorsement prevent it from being included under Coverage A is unpersuasive. *See* Dkt. No. 63 at 23-24. Reading the Primary Policy as a whole, the parties clearly intended to incorporate the endorsement under Coverage A, and the Court will not disregard unambiguous language based on inconsequential typographical errors.

8

1  subject to a $1,000,000 limit for each occurrence.  Because "occurrence" is defined in part as "an
2  accident," which plainly encompasses the allegations of the Underlying Lawsuit, Hudson posits
3  that its liability is limited in this instance to $1,000,000.  *See id.*, Ex. 1 at POLICY0027.

4  Scottsdale disagrees, arguing that the "each occurrence" limit that applies to the sum of
5  damages under Coverage A and medical expenses under Coverage C applies only to the bodily
6  injury and property damages coverage provision.  Dkt. No. 79 at 10.  In support of that
7  interpretation, Scottsdale points to the qualifying clause that ends the "each occurrence" limit
8  provision: "because of all 'bodily injury' . . . arising out of any one 'occurrence.'"  *Id.* at 11; Dkt.
9  No. 60, Ex. 1 at POLICY0023.  Because this language parallels the bodily injury and property
10 damage coverage provision, but not the Parking Operations E&O coverage provision, which
11 discusses a "negligent act, error or omission," Scottsdale argues that the "each occurrence" limits
12 of liability provision described in the Primary Policy is inapplicable to the Parking Operations
13 E&O coverage provision.  Scottsdale argues that instead, the liability coverage declaration
14 provides a limit of $1,000,000 for "each claim" made under the Parking Operations E&O coverage
15 in addition to the $1,000,000 "each occurrence" limit.  Dkt. No. 60, Ex. 1 at POLICY0005.
16 Because the underlying accident could also be classified as a negligent act, error, or omission,
17 Scottsdale contends that each of these allegedly independent coverages was triggered, requiring
18 Hudson to pay a total of $2,000,000 toward the underlying settlement.  Dkt. No. 79 at 11.

19 Hudson replies that the liability coverage declarations page does not control the
20 interpretation of the Primary Policy, and that use of the word "claim" on the declarations page
21 cannot be read as having increased the limits of liability.  *See* Dkt. No. 73 at 14-15.  Instead,
22 Hudson argues that any uncertainty regarding the use of the word "claim" must be resolved by
23 referencing the policy's liability limits, which provide that "any coverage for Parking Operations
24 E&O, was subject to the overarching per occurrence limit of [$1,000,000]," "regardless of the
25 number of . . . claims made."  *Id.* at 15; s*ee* Dkt. No. 60, Ex. 1 at POLICY0022; *see also United*
26 *Servs. Auto. Ass'n v. Baggett*, 209 Cal. App. 3d 1387, 1397 (1989); *see also George v. Auto. Club*
27 *of S. Cal.*, 201 Cal. App. 4th 1112, 1128 (2011) ("[T]he declaration [page] does not purport to set
28 forth or define the operative terms . . . any ambiguity in the declaration is resolved by the terms of

9

the policy.").

The Court previously found that Hudson correctly argued that the "each occurrence" limit clearly applies no matter how many qualifying claims trigger coverage under the bodily injury and property damage provision. *See* Dkt. No. 23 at 9. However, the Court also found that because Hudson did not address Scottsdale's argument that the "each occurrence" limit could reasonably be interpreted to apply *only* to the bodily injury and property damage provision and not the Parking Operations E&O coverage provision, the Court could not conclusively determine at the motion to dismiss stage that the declaration page's use of the word "claim" did not render the contract ambiguous. *See* Dkt. No. 23 at 9-10. Hudson now persuasively addresses that argument and resolves the issue previously identified by the Court.

Hudson contends that the "fact that the Parking Operations E&O coverage was occurrence based rather than 'claims-made' coverage is evidenced by the difference between the language of the endorsement and the language of the unambiguously 'claims-made' coverage [found elsewhere] in the policy." Dkt. No. 73 at 10. In support, Hudson points to the employee benefits liability coverage that was also added to the policy by endorsement, and which expressly states "THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE." Dkt. No. 60, Ex. 1 at POLICY0057. The employee benefits endorsement also states that coverage will only apply when, "[a] 'claim' for damages, because of an act, error, or omission, is first made against any insured . . . during the policy period . . . ." *Id.*, Ex. 1 at POLICY0057.

In contrast, the Parking Operations E&O endorsement does not state that it provides claims-made coverage. Instead, the endorsement states only that it modifies commercial general liability Coverage A, for which the limits of liability explicitly impose a $1,000,000 per occurrence limit.[4] The endorsement also states that it applies to "damages because of any negligent act, error or omission during the policy period . . . ." *See id.*, Ex. 1 at POLICY0042. The Parking Operations E&O endorsement thus does not require that a claim be made in order to

---

[4] Scottsdale argues that because the limits of liability were included on a pre-printed form they could not have contemplated inclusion of the Parking Operations E&O endorsement. *See* Dkt. No. 83 at 1, 3. This argument fails, however, as the endorsement falls within Coverage A, to which the limits of liability clearly apply, whether the limits were pre-printed or not.

trigger its application. Rather, coverage applies as soon as damages due to a negligent act, error, or omission occur. If the parties who negotiated the Primary Policy had intended to incorporate a claims-made trigger in the Parking Operations E&O endorsement, they easily could have mirrored the language included in the employee benefits liability endorsement. The fact that they did not do so strongly suggests they did not intend for the Parking Operations E&O coverage to have a claims-made trigger. *See Bank of the West*, 2 Cal. 4th at 1265 (holding that "[l]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." (internal quotations omitted)). The Court therefore finds that any potential "ambiguity in the declaration is resolved by the terms of the [Primary Policy]." *George*, 201 Cal. App. 4th at 1128 (internal quotation marks omitted).

## IV.   CONCLUSION

Because (1) the Primary Policy unambiguously incorporates the Parking Operations E&O coverage under Coverage A; (2) the limits of liability expressly state that the "Each Occurrence Limit is the most [Hudson] will pay for the sum of . . . [d]amages under Coverage A"; and (3) the each occurrence limit is $1,000,000, the Court finds that Hudson's liability was limited to $1,000,000. The Court therefore **DENIES** Scottsdale's motion for summary judgment, and **GRANTS** Hudson's motion for summary judgment.[5]

The Clerk is directed to close the case and enter judgment in favor of Hudson. Each party shall bear its own costs and attorneys' fees.

**IT IS SO ORDERED.**

Dated: 3/21/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[5] The Court does not consider Scottsdale's objections to paragraphs four and ten of the Declaration of James Brogan submitted in support of Hudson's motion for summary judgment, as the Court did not rely on those paragraphs in reaching its decision. *See* Dkt. No. 77.